# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| AZARAX, INC., | Civil No. 16-3228 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| WILLIAM SYVERSON and STINSON LEONARD STREET, LLP, | |
| Defendants. | |

Michael D. Sydow, Sr., **THE SYDOW FIRM**, 3355 West Alabama, Suite 444, Houston, TX 77098, and V. John Ella, **TREPANIER MACGILLIS BATTINA P.A.**, 310 Fourth Avenue South, Suite 8000, Minneapolis, MN 55415, for plaintiff.

Brooke D. Anthony, and Norman H. Pentelovitch, **ANTHONY OSTLUND BAER & LOUWAGIE PA,** 90 South Seventh Street, Suite 3600, Minneapolis, MN 55402, for defendants.

Plaintiff Azarax, Inc. ("Azarax") alleges that Defendants William Syverson ("Syverson") and Stinson Leonard Street LLP ("SLS") committed legal malpractice by representing and undermining its predecessor in an international transaction.[1] Defendants now move the Court for summary judgment. Because the Court finds both that Azarax lacks standing to pursue this claim and that, even if it could show standing, no attorney-client relationship existed between Defendants and Azarax's predecessor, the Court will

---

[1] Originally, Azarax brought eight counts against a number of defendants. (*See generally* Am. Compl., Dec. 16, 2016, Docket No. 31.) Pursuant to the parties' stipulation, the Court dismissed all claims against all the other Defendants except the legal malpractice claim against Syverson and SLS. (Order of Dismissal, Aug. 7, 2018, Docket No. 162.)

grant summary judgment for Defendants and dismiss the case in its entirety.[2]

## BACKGROUND

### I. 2011 AND INITIAL AGREEMENTS

Azarax is the purported successor stemming from the merger of a Mexican corporation named Convey Communications S.A. de C.V. ("Convey Mexico") and a Panamanian corporation named 14 Biz Holdings. (Am. Compl. at 2, 4, Dec. 16, 2016, Docket No. 31.)

Syverson was a partner at the law firm of Leonard Street & Deinard and remained a partner when Leonard Street & Deinard merged with Stinson Morrison Hecker in 2015 to become Stinson Leonard Street ("SLS"). (Pl.'s Mem. Opp. at 5, Jan. 21, 2019, Docket No. 247.)[3] While working for Leonard Street & Deinard and SLS, Syverson represented a company named Wireless Communications Ventures, LLC ("WCV"). (Decl. of Brooke D. Anthony ("Anthony Decl.") ¶ 2, Ex. 9 ("Syverson Dep.") at 70, Dec. 21, 2018, Docket No. 219-1.) WCV was formed to pursue telecommunications investment opportunities. (Anthony Decl. ¶ 2, Ex. 8 ("Scapanski Dep.") at 60, Docket No. 219-1.)

In early 2011, Syverson and WCV began negotiations with Convey Mexico in pursuit of a joint telecommunications business venture. (Syverson Dep. at 74.) Convey Mexico was represented in the negotiations by Nicolas Barrera, Guy Rosbrook, and Garry

---

[2] Defendants also move the Court to exclude the expert testimony of Jeffrey A. Johnston. Because the Court will grant Defendants' motion for summary judgment, the Court will deny the motion to exclude as moot.
[3] Some facts cited by Azarax are not fully supported by their accompanying filings or are supported only by exhibits the Court will not consider. But even taking the facts as stated in Azarax's opposition brief as true, summary judgment for Defendants is warranted.

Donoghue (collectively referred to as the "Convey Group"). (Anthony Decl. ¶ 2, Ex. 47 at 62-66, Docket No. 219-6; Anthony Decl. ¶ 2, Ex. 27 at 40, Docket No. 219-2.) As a result of these negotiations, WCV agreed to invest $1 million in Convey Mexico in exchange for 20% ownership. (Anthony Decl. ¶ 2, Ex. 17 ("Rosbrook Email") at 164, Docket No. 219-1; Anthony Decl. ¶ 2, Ex. 33 ("Dallas Agreement") at 12, Docket No. 219-3.) The negotiations leading to this agreement were adversarial, with both sides aware that Syverson represented WCV. For instance, on February 25, 2011, Rosbrook sent an email to the rest of the Convey Group informing them that Rosbrook had reached an agreement with WCV but that "the negotiations had its moments, such as [Syverson] dressed in his best clothes with his game face on for a tough negotiation." (Rosbrook Email at 164.)

After the initial investment agreement, the two sides began negotiating the creation of a new joint company for the purpose of pursuing Multi-ISMI Technology, a cell phone technology that allows users to operate the same cell phone in different countries without incurring roaming charges. (Pl.'s Mem. Opp. at 6.) Once again, negotiations were adversarial. On May 20, 2011, Syverson sent Rosbrook and Donoghue an email outlining WCV's response to a proposed term sheet. (Anthony Decl. ¶ 2, Ex. 18 at 167, Docket No. 219-1.) In the email, Syverson details the problems WCV has with the term sheet and outlines "our preferred position," meaning WCV's preferred position. (*Id.*) In response to not being included on the email, Barrera explained to Rosbrook and Donoghue that "[t]his is an excellent example of how [Syverson] divided us . . . he is not your friend and never will be. He is not on our side and will never be." (*Id.*) Rosbrook agreed and stated that

"[Syverson] is an attorney and we shouldn't have let an attorney get in so deep on this deal or with us." (*Id.*)

On May 27, 2011, Rosbrook sent an email to Barrera and Donoghue expressing distrust of Syverson. (Anthony Decl. ¶ 2, Ex. 19 at 171, Docket No. 219-1.) In response, Donoghue stated that "[Syverson] is an idiot, or extremely smart, now perhaps we know why he was stalling on the Mexican agreements." (*Id.* at 171.) Barrera explained that Syverson had lied to him regarding an investment agreement. (*Id.* at 170.) On June 14, Barrera sent the others an email stating: "I have patiently been waiting for [Syverson] to send over a term sheet and [Shareholders Agreement] to then build a case and strategy. So far I have not had any communication from WCV . . . the ball is on their side." (Anthony Decl. ¶ 2, Ex. 20 at 173, Docket No. 219-1.) On June 30, Rosbrook sent an email detailing negotiation strategy, suggesting a unified front against WCV and Syverson, informing the other two men of WCV's positions, and referring to WCV and Syverson interchangeably. (Anthony Decl. ¶ 2, Ex. 21 at 178, Docket No. 219-1.) Rosbrook also suggested that the Convey Group have an attorney look at the proposed agreement before moving forward. (*Id.*) The Convey Group did eventually have an attorney review the term sheet. (Anthony Decl. ¶ 2, Ex. 47 at 63, Docket No. 219-6.)

Despite the tense back and forth, the negotiations were ultimately successful, and resulted in the creation of AmRoam Holdings, LLC ("AmRoam"). (Dallas Agreement at 12.) The Dallas Agreement was the first informal document to commemorate the agreement and was signed by the parties on September 23, 2011. (*Id*. at 12-13.) Syverson was the only attorney present at this meeting. (Decl. of Michael D. Sydow ("Sydow Decl.")

¶ 7, Ex. F ("2d Syverson Dep.") at 82-83, Jan. 21, 2019, Docket No. 252.) On October 13, 2011, the parties formalized the Dallas Agreement and laid out the formation of the company by signing the AmRoam Agreement. (Anthony Decl. ¶ 2, Ex. 43 ("AmRoam Agreement") at 5, Docket No. 219-6.) The AmRoam Agreement was drafted by Syverson. (Syverson Dep. at 74.) Between the two agreements, the parties established that WCV owned a 52% interest in AmRoam and 14 Biz Holdings owned a 48% interest, (Dallas Agreement at 12); that Convey Mexico would use AmRoam as its exclusive service provider in the United States, (*id.*); and that Barrera would act as the CEO/President of AmRoam, (AmRoam Agreement at 49).

Subsequently, Convey Mexico created a new shareholder agreement ("SHA") to memorialize WCV's agreed upon 20% interest. (Anthony Decl. ¶ 2, Ex. 24 ("Convey SHA"), Dec. 21, 2018, Docket No. 220.) The new Convey SHA was drafted by Syverson. (2d Syverson Dep. at 64.) Syverson claims that he drafted the Convey SHA as the legal representative of WCV. (*Id.*)

Prior to the Dallas Agreement, AmRoam Agreement, and SHA being signed, WCV asked Syverson to serve as AmRoam's attorney, and Syverson executed an engagement letter which stated that he was hired for the purpose of facilitating AmRoam's formation, that his "sole client will be AmRoam Holdings," and that he would "not be representing any other person or entity in the matter." (Anthony Decl. ¶ 2, Ex. 36 at 7, Dec. 21, 2018, Docket No. 222.) He executed a similar engagement letter after the Dallas Agreement was signed, stating that he would function as AmRoam's attorney for its "general business matters" and that AmRoam would be Syverson's only client "in the matter." (*Id.* at 3.)

## II.     THE ENSUING YEARS AND FAILURE OF THE JOINT VENTURE

After the creation of AmRoam and installation of Barrera as its CEO, AmRoam began looking for telecommunications investment opportunities.  In early 2013, Barrera negotiated a preliminary contract on behalf of Convey Mexico (the "Convey-Nextel Agreement"), in which Convey Mexico and Nextel, a Mexican telecommunications company, would jointly provide cellular services in the U.S. and Mexico to allow users to make cross border calls without incurring roaming charges.  (Anthony Decl. ¶ 2, Ex. 48 at 69-91, Docket No. 219-6.)

The Convey-Nextel agreement was executed in Spanish and was not written or negotiated by Syverson.  (*See* Anthony Decl. ¶ 2, Ex. 46 at 59, Docket No. 219-6; Syverson Dep. at 76.)  Syverson took issue with the contract, because he believed that the agreement should have been between AmRoam (or one of its subsidiaries) and Nextel, given that AmRoam was established for the purpose of pursuing these types of opportunities.  (Anthony Decl. ¶ 2, Ex. 29, Docket No. 221; Syverson Dep. at 76-77.)  Accordingly, Syverson asked Barrera to send him the contract and to ensure that the contract belonged to AmRoam, or at least that AmRoam would be the benefactor.  (Anthony Decl. ¶ 2, Ex. 29.)  Barrera confirmed that the contract would end up belonging to AmRoam.  (*Id.*)  In response, Syverson reiterated to Barrera and Donoghue that "[i]t is going to be extremely important that from here on out that **we, meaning WCV,** be involved in the process of finalizing contracts," and asked that WCV be included in the future so that its input would be taken into account.  (Anthony Decl. ¶ 2, Ex. 46 at 59 (emphasis added).)

The parties disagree substantially over what happened next. Both sides agree that Convey and Nextel spent the next year and a half working towards the introduction of the cross-border technology. However, the joint venture between Nextel and Convey fell apart in August 2014.

Azarax contends that Syverson covertly met with Nextel and essentially sabotaged the Convey-Nextel project by telling Nextel that Convey Mexico was failing to keep up its end of the agreement, by trying to convince Nextel to terminate that contract, and by trying to convince Nextel to sign with another company owned by WCV. (Pl.'s Mem. Opp. at 12-13.) These actions, Azarax contends, were in violation of the duties Syverson owed Convey Mexico due to the attorney-client relationship.

Defendants, on the other hand, contend that Nextel had grown disenchanted with Convey Mexico and that Syverson intervened in an attempt to save the joint venture. (Defs.' Mem. Supp. at 16-18, Dec. 12, 2018, Docket No. 230.) In the end, the Convey-Nextel agreement did not come to fruition.

## DISCUSSION

## I.     EVIDENTIARY CHALLENGES

In response to Defendants' Motion for Summary Judgment, Azarax submitted declarations from Garry Donoghue, Roger Maddock, Chris White, and Michael Amissah. (*See* Sydow Decl. ¶¶ 4-6, 8, Exs. C, D, E, G.) As noted above, Donoghue was one of the original members of the Convey Group. Maddock, White, and Amissah, however, were individuals that did not work for Convey Mexico but became involved with Convey

Mexico at various points before 2015. (*See generally id.*; Pl.'s Mem. Opp. at 26.) Each of these individuals states, with no ambiguity, that Syverson acted as Convey Mexico's attorney at some point during the years following the 2011 Dallas Agreement.

Defendants argue that the Court should refuse to consider these declarations as evidence to defeat summary judgment because the four individuals' information was never provided to them during discovery. In Defendants' initial request for admission, Azarax stated that, while there was no formal retainer agreement between Syverson and Convey Mexico, "Syverson's representation of [Convey Mexico] was communicated to [Convey Mexico] verbally, via overt actions, and stated in emails." (Anthony Decl. ¶ 2, Ex. 22 at 182-83, Docket No. 219-1.) In the corresponding interrogatory, Azarax provided to Defendants "nineteen specific documents" showing how the attorney-client relationship was formed. (Anthony Decl. ¶ 2, Ex. 23 at 188, Docket No. 219-1.) In a supplemental interrogatory response, Azarax explained that the attorney-client relationship arose from the Convey-Nextel agreement, provided two additional documents relevant to this relationship, and informed Defendants that it expected to receive additional information in this regard and would supplement its responses when it did. (*Id.* at 188-89.)

Defendants argue that the revelations contained in the four declarations submitted after filing of a summary judgment motion and after discovery amount to an ambush and an attempt by Azarax to change the facts to fit its argument. Defendants argue, therefore, that the declarations should not be considered.

The Court agrees. The scheduling order in this case warns that "[a]ny evidence responsive to a discovery request which has not been disclosed on or before the discovery

cutoff . . . shall be excluded from trial." (2nd Am. Scheduling Order at 6, May 25, 2018, Docket No. 145.) Azarax was well aware that a central part of its attorney malpractice claim was establishing an attorney-client relationship, and was well aware that Defendants were seeking the basis for Azarax's belief that such a relationship existed. After all, Azarax informed Defendants that the relationship was established through verbal communications, overt actions, and emails. It then produced **nineteen** documents in support of that statement, but never produced the information it now relies on to survive summary judgment on this issue.

One of the purposes of discovery "is to enable parties to obtain the factual information needed to prepare their cases for disposition." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1536 (8th Cir. 1996). Another is to "narrow the issues before the court in preparation for trial." *Owens v. SunTrust Bank, Inc.*, No. 1:12-CV-2899-WBH, 2014 WL 12776505, at *10 (N.D. Ga. Oct. 7, 2014). By delaying disclosure of the information contained in these four declarations, Azarax has undercut both purposes. Azarax not only deprived the Defendants of crucial information that may have changed the way Defendants approached this case, they also "force[d] the court to double its efforts and review nearly all of the discovery in this case." *Id.* Instead of properly using discovery to present the facts, thereby narrowing and clarifying the points of dispute, Azarax abused the process in what was either an attempt to keep Defendants in the dark for as long as possible or an attempt to introduce new facts to keep this case going. Either way, the Court finds the last-second disclosure of potentially vital information improper, and thus refuses to consider it at this stage.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in a light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Azarax alleges that Defendants committed legal malpractice stemming from the various transactions that took place.  It asserts that "Syverson and SLS had a duty to inform Plaintiff of their conflicts of interest, detail the disadvantages of them representing multiple parties with conflicts of interest, and disqualify themselves as counsel for Plaintiff."  (Am. Compl. ¶ 80.)  Defendants now move for summary judgment of Azarax's legal malpractice

claim, arguing that Azarax lacks standing and that the legal malpractice claim fails on the merits.[4]

## III. STANDING

"In order to have standing, a party must have a 'case or controversy' under Article III of the Constitution." *Hodak v. City of St. Peters*, 535 F.3d 899, 903 (8th Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Constitutionally, "a party must have [1] suffered an 'injury in fact,' an actual or imminent concrete and particularized invasion to a legally protected interest; [2] the injury must be fairly traceable to the challenged action of the defendant; and [3] the injury must be redressable by a favorable decision." *Id.* (citing *Lujan*, 504 U.S. at 560).

However, "[e]ven if a plaintiff meets the minimal constitutional requirements for standing, there are prudential limits on a court's exercise of jurisdiction*." Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1378 (8th Cir. 1997). For instance, "a plaintiff may only assert his own injury in fact and 'cannot rest his claim to relief on the legal rights or interests of third parties.'" *Hodak*, 535 F.3d at 904 (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)).

As noted above, Azarax's legal malpractice claim and the attorney-client relationship on which the claim is based do not relate to Syverson's representation of Azarax. Instead, Azarax's claim is based on Syverson's alleged wrongdoing as Convey

---

[4] Defendants also argue that Azarax failed to comply with expert disclosure requirements. Because the Court concludes that Azarax has not shown standing and that—even if they had—no attorney-client relationship existed, the Court will not discuss these arguments.

Mexico's attorney. Nevertheless, Azarax asserts that it has standing to bring the legal malpractice claim because it is the valid successor-in-interest of Convey Mexico.

Defendants argue Azarax has not adequately shown that it is the successor-in-interest to Convey Mexico. They point out that Convey Mexico's SHA required that any merger involving Convey Mexico be approved by a unanimous vote of Convey Mexico's shareholders, and that no such shareholder vote took place. Accordingly, Defendants argue that the purported merger between 14 Biz Holdings and Convey Mexico was invalid and that Azarax is not the legal successor-in-interest to Convey Mexico.

Because Azarax is invoking federal jurisdiction, it "bears the burden of establishing" standing. *Lujan*, 504 U.S. at 561. Standing is "not [a] mere pleading requirement[] but rather an indispensable part of the plaintiff's case." *Id.* At summary judgment, "the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts, . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (quotation omitted.)

Although Azarax does not contest the fact that a unanimous vote including WCV never took place, it puts forth several arguments in an attempt to show that the lack of a shareholder vote is not determinative of standing.

First, Azarax contends that WCV was not a valid shareholder and that its vote to merge was therefore unnecessary. This new assertion directly contradicts several previous admissions that WCV was a shareholder. For instance, in response to an interrogatory, Azarax identified WCV as a shareholder of Convey Mexico. (2d Decl. of Brooke Anthony ("2d Anthony Decl.") ¶ 2, Ex. 6 at 22, Feb. 4, 2019, Docket No. 263-1.) Azarax has never

before challenged WCV's status as a shareholder of Convey Mexico and has submitted documents to the Court showing that it was. The Court finds this last-second argument fundamentally incorrect and directly contradictory to Azarax's prior assertions.

Second, Azarax argues that, even if the SHA was valid and WCV was a shareholder, Mexican law would invalidate the unanimous vote provision. Again, this argument was first raised in response to Defendants' summary judgment motion. In support, Azarax submits the declaration of John Hannan, a professor at Rice University who is licensed to practice law in both the U.S. and Mexico. Hannan concludes that the unanimous vote provision would be invalid under the *Ley General de Sociedades Mercantiles*, the corporation law of the Republic of Mexico. Azarax additionally invokes Federal Rule of Civil Procedure 44.1 to inform Defendants that it intends to rely on this foreign law.

The Court finds these last second submissions improper. Rule 44.1 requires "[a] party who intends to raise an issue about a foreign country's law" to "give notice by a pleading or other writing." "Congress passed Rule 44.1 in 1966 to avoid unfair surprise." *Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.*, 426 F.3d 580, 585 (2d Cir. 2005). "Where the applicability of foreign law is not obvious at the outset . . . notice . . . may come at any time sufficient to give the court and the defendants adequate notice of the need to research the foreign rules." *Hodson v. A.H. Robins Co.*, 528 F. Supp. 809, 824 (E.D. Va. 1981).

Factors to be considered in determining the reasonableness of notice include "[t]he stage which the case had reached at the time of the notice, the reason proffered by the party for his failure to give earlier notice, and the importance to the case as a whole of the issue

of foreign law sought to be raised." Rule 44.1 Advisory Notes. In the present case, Azarax's notice is insufficient. This case has been ongoing for over three years and has reached summary judgment. Azarax provides no reason for its late notice. Furthermore, Defendants have contested standing since their initial answer, yet Azarax has never before made this argument, thus depriving Defendants of timely notice of the importance of Mexican law to the standing issue. Azarax's standing is a central question and has been since the beginning. Thus, Azarax's delay in putting Defendants—and the Court—on notice under Rule 44.1 is not reasonable and the Court will not consider the *Ley General's* effect on the SHA. Accordingly, Azarax's argument that the *Ley General* invalidates the unanimous vote requirement fails.

Finally, Azarax contends that, even if the unanimous vote provision was valid, WCV tacitly endorsed the merger of Convey Mexico into Azarax when WCV agreed to transfer its shares of Convey Mexico into an entity called Convey Jersey. Azarax contends that "[t]he Convey Jersey agreement requires that Convey Mexico be merged into Azarax Holdings as part of the organization of Convey Jersey." (Mem. Opp. at 17.) This contention is not supported by the evidence provided, which says nothing about Convey Mexico being merged into Azarax. (*See* Sydow Decl. ¶ 19, Ex. R at 42, Jan. 21, 2019, Docket No. 249.)

Defendants have challenged Azarax's standing as the successor-in-interest of Convey Mexico since the beginning of this case. Instead of providing Defendants with the information on which it based its legitimacy, Azarax chose to wait until summary judgment to present new facts and theories to defeat Defendants' arguments. But the evidence

presented by Azarax does not show that it is the successor-in-interest of Convey Mexico. Azarax has failed to create a genuine dispute of material fact on standing, and the Court will therefore grant Defendants' motion for summary judgment.

## IV.    LEGAL MALPRACTICE

Even if Azarax could demonstrate standing, the Court would not find a genuine dispute of material facts on Azarax's legal malpractice claim.

In Minnesota, to succeed on a claim "for legal malpractice arising out of representation in a transactional matter" based on professional negligence or breach of contract, Azarax must prove: "(1) an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts proximately caused the plaintiff's damages; and (4) that but for the defendant's conduct, the plaintiff would have obtained a more favorable result in the underlying transaction than the result obtained." *Schmitz v. Rinke, Noonan, Smoley, Deter, Colombo, Wiant, Von Korff & Hobbs, Ltd.*, 783 N.W.2d 733, 738–39 (Minn. Ct. App. 2010) (citing *Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816, 819 (Minn. 2006)). "If the plaintiff does not provide sufficient evidence to meet all of these elements, the claim fails." *Jerry's*, 711 N.W.2d at 816.

Defendants argue that summary judgment is warranted because Azarax fails to create a genuine dispute of material fact as to whether an attorney-client relationship

existed.[5]  Under Minnesota law, an attorney-client relationship may be found to exist under either a contract theory or a tort theory.  *Admiral Merchants Motor Freight, Inc. v. O'Connor & Hannan*, 494 N.W.2d 261, 265 (Minn. 1992).  Azarax argues that a genuine dispute of material fact exists to support the existence of an attorney-client relationship under either theory.

### A.    Contract Theory

A contract for legal services can be express or implied and can be "deduced from the circumstances, relationship, and conduct of the parties."  *McIntosh Cty. Bank v. Dorsey & Whitney, LLP*, 745 N.W.2d 538, 549 (Minn. 2008) (quoting *High v. Supreme Lodge of World, Loyal Order of Moose*, 298 N.W. 723, 725 (Minn. 1941)).

There is no indication, nor does Azarax argue, that an attorney-client relationship was created via an express contract.  Azarax instead argues that an implied contract arose between Syverson/SLS and Convey Mexico.  In an implied contract situation, "'it is not expected that the elements of a contract will be as vividly portrayed by the evidence as where an express contract has been pleaded,' [but] reliance on an implied contract 'does not relieve [a] plaintiff from his burden of establishing all essential contractual ingredients.'"  *Id.* (quoting *High*, 745 N.W.2d at 549).  Therefore, while "[a] contract implied in fact is in all respects a true contract," Azarax still has the burden to show mutual

---

[5] They also argue that Azarax fails to create a genuine issue of material fact as to whether Defendants were the but-for cause of Plaintiff's damages and argue that Azarax cannot show damages sufficient to survive summary judgment.  Because the Court concludes that no attorney-client relationship existed, the Court need not consider these alternate grounds for granting the motion.

assent from both sides. *George E. Antrim, III, PLLC v. Sabri*, No. A13-2174, 2014 WL 4798922, at *3 (Minn. Ct. App. Sept. 29, 2014) (quoting *Roberge v. Cambridge Coop. Creamery*, 79 N.W.2d 142, 145-46 (Minn. 1956)). "'Mutual assent entails a meeting of the minds concerning a contract's essential elements,' and '[w]hether mutual assent exists is tested under an objective standard.'" *Id.* (quoting *SCI Minn. Funeral Servs. v. Washburn–McReavy Funeral Corp.*, 795 N.W.2d 855, 864 (Minn. 2011)).

Without considering the declarations discussed above, Azarax relies on the following facts as evidence that an implied contract existed: (1) Syverson provided legal immigration advice to Barbosa, an associate of Barrera's and part owner of Convey Mexico; (2) Syverson drafted the new Convey Mexico SHA subsequent to the Dallas Agreement; and (3) Barrera sent an email to Roberto Carballo, Convey Mexico's Mexico attorney, which introduced Syverson as the "company lawyer," a characterization that Syverson did not correct.

The "determination of the existence of an implied contract for legal services involves an examination of the communications and circumstances surrounding a transaction." *McIntosh Cty. Bank v. Dorsey & Whitney*, LLP, 726 N.W.2d 108, 117 (Minn. Ct. App. 2007). While the determination is therefore done on a case-by-case basis, Minnesota courts have provided useful analysis of this issue. For example, in *TJD Dissolution Corp. v. Savoie Supply Co.*, the Minnesota Court of Appeals found that an implied contract had not been created in part because the alleged client "did not request [the attorney] to represent him, [the attorney] never promised to represent him, and [the

attorney] sent no bills . . . for services rendered on his behalf." 460 N.W.2d 59, 62 (Minn. Ct. App. 1990).

The same is true here. Azarax provides no evidence that would support an inference of mutual assent. It has not provided any communications between the parties which show that Syverson intended to serve as Convey Mexico's attorney, has not provided any evidence that Syverson was ever paid by Convey to serve as its attorney, and has not provided evidence that Convey requested Syverson to serve as its attorney. Without evidence of this nature, there are no grounds on which the Court could find that an implied contract was created at some point after the 2011 Dallas Agreement.

### B.    Tort Theory

Azarax also asserts that an attorney-client relationship arose under the tort theory. Under the tort theory, "an attorney-client relationship is created whenever an individual seeks and receives legal advice from an attorney in circumstances in which a reasonable person would rely on such advice." *Admiral Merchants*, 494 N.W.2d at 265-66. "Although reasonableness depends on the circumstances, courts have generally focused on the interactions between the plaintiff and the attorney to determine whether the plaintiff's reliance was reasonable." *McIntosh Cty. Bank*, 726 N.W.2d at 119 (citations omitted).

As an initial matter, it is unclear to the Court that Convey Mexico sought or received legal advice from Syverson. The root of Azarax's claim is not that Syverson gave incorrect legal advice to Convey Mexico which caused it harm, but that Syverson betrayed Convey Mexico in violation of an already established attorney-client relationship. Accordingly, Azarax must highlight some previous instance of "advice" being sought out by Convey

Mexico and provided by Syverson in order to establish that an attorney-client relationship existed at the time of the betrayal. *See Schuler v. Meschke*, 435 N.W.2d 156, 162 (Minn. Ct. App. 1989) (stating that "[t]he requirement under this theory is that an attorney must have provided legal advice or service"); *Gramling v. Mem'l Blood Centers of Minn.*, 601 N.W.2d 457, 460 (Minn. Ct. App. 1999) ("Absent a request for legal advice, we cannot conclude an attorney-client relationship existed under the tort theory of representation.")

To do so, Azarax again relies on the same three pieces of evidence discussed above. However, none of this evidence indicates that Convey Mexico sought advice from Syverson or that Syverson provided advice to Convey Mexico. It is true that Syverson gave legal immigration advice to Barbosa, but it is also true that, while Barbosa worked for Convey Mexico, he also worked for AmRoam. Syverson testified that he provided the immigration advice to Barbosa because Barbosa was seeking a U.S. work permit to do work for AmRoam. (Syverson Dep. at 73.) Similarly, while Barrera once introduced Syverson as the "company lawyer," Barrera was AmRoam's CEO. Not only does this email introduction fail to establish that Convey Mexico sought advice and that Syverson ever provided legal advice, it is plausible that Barrera was introducing Syverson as AmRoam's company lawyer.

Even the fact that Syverson drafted the Convey Mexico SHA does not establish that Convey Mexico asked for legal advice or that Syverson gave legal advice. The SHA was created in 2011 as a result of the agreements between WCV and Convey Mexico. The various agreements of that year established that WCV would take a 20% interest in Convey Mexico. Accordingly, Syverson testified that he created the SHA draft for WCV as a new

minority shareholder and that Convey Mexico told him that it had its own lawyers. (2d Syverson Dep. at 64.) Azarax puts forth no evidence suggesting that Convey Mexico asked Syverson to draft the SHA for it.

Assuming, for the sake of argument, that there was evidence that Convey Mexico sought and received legal advice from Syverson, Azarax fails to establish that Convey Mexico's reliance on Syverson's advice would have been reasonable. Like an implied contract theory, whether an attorney-client relationship exists under a tort theory "is usually a question of fact dependent upon the communications and circumstances" specific to the case. *Admiral Merchants*, 494 N.W.2d at 265. Nevertheless, Minnesota courts provide guidance about when reliance may be reasonable. For instance, in *McIntosh County Bank*, the court found that a plaintiff's reliance on a law firm was unreasonable where the law firm made the plaintiff "affirm that [the plaintiff] had made an 'independent and informed judgment'" regarding the loan agreement at issue. 726 N.W.2d at 119. Likewise, in *TJD Dissolution Corp.*, the court found a plaintiff's reliance unreasonable where: (1) the plaintiff knew that the attorney represented a party that was adverse to him; (2) the plaintiff was aware that the attorney "had represented the [adverse party] for a number of years and owed allegiance to" the party; and (3) the attorney had "advised [plaintiff] at least once, and possibly twice, to retain his own counsel." 460 N.W.2d at 62.

Similar facts are present here. It is undisputed that WCV (represented by Syverson) and Convey Mexico were, for most of 2011, adversaries as they negotiated an agreement. Convey Mexico and its officers were clearly aware of that fact, as demonstrated by the

emails sent between them.  Likewise, Convey Mexico was aware that Syverson was intricately intertwined with WCV and had been for some time.

Nevertheless, Convey Mexico contends that this adversarial relationship extinguished after the two parties came to an agreement and formed AmRoam, such that it would not have been unreasonable for them to rely on legal advice provided by Syverson. However, this contention is belied by the overall record.  It may be true that Syverson and WCV were no longer actively negotiating against one another, but it also remained true that WCV and Syverson viewed themselves as separate from Convey Mexico, and Convey Mexico was aware of that fact.  For example, Syverson's engagement agreements with AmRoam specified that AmRoam would be Syverson's only client.  There is no evidence that a similar agreement was contemplated with Convey Mexico, despite Convey Mexico entering into an engagement agreement with a Mexican law firm in 2013.

Additionally, after Barrera negotiated the Convey-Nextel Agreement in 2013, Syverson objected and argued that AmRoam, not Convey Mexico, was the party who should own that contract.  He then chastised Barrera for going through with the agreement without seeking WCV's input and demanded that Barrera seek WCV's input before signing such contracts.  He also reemphasized that this had always been WCV's position.  There is no similar evidence showing that Syverson ever represented himself as protecting Convey Mexico's interests.

Given these facts, the Court finds that Azarax has not created a genuine factual dispute regarding whether it would have been reasonable for Convey Mexico to rely on Syverson's advice.  The question is, of course, somewhat muddied by the fact that Azarax

fails to identify when exactly Convey Mexico sought and received advice from Syverson or what advice it received. Regardless, Convey Mexico—at all relevant periods—knew that Syverson and WCV were aligned and had a long history together. Further, Convey Mexico was aware that, while it and WCV had a more cordial relationship following the 2011 agreements, Convey Mexico and WCV were never completely unified. Syverson made clear that Convey Mexico's successes were not necessarily WCV's successes, and that Syverson would continue to fight for WCV's interests. Further, Convey Mexico was aware that attorney engagement letters were commonplace but never approached Syverson about signing one. There is simply nothing in the record that would lead the Court to find that a reasonable company in Convey Mexico's position would have relied on what it believed was Syverson's legal advice. Azarax has therefore failed to create a genuine dispute as to whether an attorney-client relationship existed.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants Stinson Leonard Street, LLP, and William Syverson's Motion for Summary Judgment [Docket No. 216] is **GRANTED**.

2.      Defendants' Motion to Exclude the Expert Testimony of Jeffrey A. Johnston [Docket No 207] is **DENIED** as moot.

3.      Azarax, Inc.'s Amended Complaint [Docket No. 31] is **DISMISSED** with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 15, 2019                          _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                       JOHN R. TUNHEIM
                                                 Chief Judge
                                                 United States District Court